352 So.2d 916 (1977)
Daniel Anderson NAZWORTH, Appellant,
v.
STATE of Florida, Appellee.
No. EE-286.
District Court of Appeal of Florida, First District.
November 29, 1977.
Rehearing Denied January 6, 1978.
Michael J. Minerva, Public Defender, for appellant.
Robert L. Shevin, Atty. Gen., and A.S. Johnston, Asst. Atty. Gen., for appellee.
*917 RAWLS, Judge.
Nazworth was charged with killing a 3-year old child by beating her with his hands, feet and a belt. He now appeals his conviction of second degree murder.
Nazworth; his 16-year old half-brother, John Stinson O'Neal; the mother of the deceased child; and the deceased child lived together in an apartment. At approximately 6:30 on the night the child died, O'Neal drove the mother to her place of work where she was employed as a topless go-go dancer. O'Neal returned to the apartment. During the material time period,[1] only O'Neal and Nazworth were with the child. At approximately 11:00 p.m., O'Neal and Nazworth carried the child to a hospital. She was examined by a physician who testified that the child was dead on arrival and that she suffered from "battered child syndrome".
Of critical importance is the introduction of certain testimony, over the vigorous objection of defense counsel, given by John Stinson O'Neal at a bond hearing for Nazworth. The trial court, in the absence of the jury, found that the state had exercised due diligence to locate O'Neal but had been unsuccessful in this endeavor. In summarizing to the trial court the testimony O'Neal gave at Nazworth's bond hearing, the state candidly admitted that "without his testimony, of course, the Court would be forced to direct a verdict." Counsel for the state further noted that O'Neal was declared a court witness at the bond hearing. Counsel then stated that the proffered testimony would reflect that on the night of the offense and the material period at time, only O'Neal and Nazworth were with the child; that O'Neal testified he did not strike the child, so the inference is that Nazworth did. A written statement given by O'Neal was then alluded to which the state advised the court that it did not seek to introduce. In referring to the bond hearing, counsel noted:
"... the court went through the statement line by line and said what is true and what is not true and what are you denying and the court did not infringe, but he clarified certain statements... .
"Therefore, the court did not unduly commit itself one way or another as to whether or not the man was talling [sic] the truty [sic]... ."
The state then proffered the entire transcript of the bond proceedings with a request that the portions of the actual statement put into evidence be deleted.
At this point, defense counsel vigorously objected to the admission of O'Neal's testimony given at the bond hearing, primarily, upon the ground that O'Neal stated that he had been arrested for first degree murder and had been threatened with a perjury charge, and thus his testimony, to a great extent, was the result of threats. Excerpts of O'Neal's testimony adduced at the bond hearing support the observations by defense counsel.[2] Corroboration of the threats were proffered by examination of O'Neal's mother, who testified that a detective told O'Neal if he didn't testify as to what was "typed on those papers" that he would get 15 years for perjury. This proffer was erroneously denied by the trial court.
O'Neal's testimony at the bond hearing basically was to the effect that the bruises and contusions suffered by the minor child were inflicted by her mother. The state's direct examination and defense's cross of O'Neal encompassed a total of eight pages. Re-direct examination by the state, utilizing the written statement given by O'Neal within a few hours of the death of the minor child for impeachment purposes, covered 42 pages of the transcript.
Testimony of a witness taken in the course of a judicial proceeding, when a *918 proper predicate has been laid, may be admitted into a subsequent trial. Putnal v. State, 56 Fla. 86, 47 So. 864 (1908). As a whole, Florida cases which have permitted the use of transcripts of prior judicial proceedings have involved a defendant's former trial or preliminary hearing. Putnal v. State, supra; Bexley v. State, 51 So. 278 (Fla. 1910); Johnson v. State, 68 Fla. 528, 67 So. 100 (1914); Blackwell v. State, 79 Fla. 709, 86 So. 224 (1920); Richardson v. State, 247 So.2d 296 (Fla. 1971); and James v. State, 254 So.2d 838 (Fla. 1st DCA 1971). As quoted in Richardson v. State, supra, Professor Wigmore, in explaining this rule, states:
"... The statement may have been made before the present trial, but if it has been already subjected to proper cross-examination, it has satisfied the rule and needs no exception in its favor. This is worth clear appreciation, because it involves the whole theory of the rule." (emphasis supplied)
As may be gleaned from the facts surrounding the subject controverted testimony, a proper predicate was not laid for the admission of O'Neal's testimony nor was the testimony subject to proper cross-examination. A bond hearing is for the purpose of setting bond. The inquiry conducted bears little or no resemblance insofar as defendant is concerned with trial. O'Neal's testimony at the bond hearing was tainted with the same infirmities as we found present in Davis v. State, 334 So.2d 823 (Fla. 1st DCA 1976). The extensive re-direct of O'Neal by the state after the limited cross-examination by Nazworth's counsel did not afford defendant an opportunity for proper cross that would have been available had O'Neal testified at trial.
The judgment appealed is reversed with directions that a new trial be granted.
McCORD, C.J., and SMITH, J., concur.
NOTES
[1] The bill of particulars alleged that the crime was committed between 6:00 p.m. and 12:00 midnight on June 16, 1976.
[2] O'Neal testified: "He told me I was going to get the electric chair for murder ... He told me I was going to jail for the belt and beating her." In answer to a question: "How many different stories did you tell them?", O'Neal's response was: "... about five."